Please be seated. All right, gentlemen, the next case on the docket is Taylor v. Bi-County Health Department, cause number 5-9-475. And Mr. Dart, you may proceed. Thank you, Mr. Court. My name is John Dahl, and I'm here as a co-counsel on behalf of the Defendant Athlete, Bi-County, along with Christopher Tierney. Chris was admitted to PROACT-BJ in the trial court, and I've been advised that he needs to be admitted this morning for purposes of the client's preference of presenting an argument. And so I will report him to them, and also consult with Mr. Dart who has no objection. All right, we'll grant that motion. We'll ask that you follow it up with a written motion and order. And Mr. Tierney, you'll be allowed to, Attorney, you'll be allowed to argue this morning. Is that right, Mr. Dart? You have no objection? No objection. Okay, please report to counsel. Good morning. My name is Lanny Dart, and I represent Logan Taylor and his mother, Cora Taylor. And we're here today to determine whether a health care professional employed by a public entity owes the same level of duty as an individual or owes a duty to his patients the same as if he was acting in the private sector. Now, that issue has been addressed a number of times by a number of courts, and they've always said that a health care professional, whether they be employed in the public sector or the private sector, owes a duty of care to its patients, the same as anyone else. Nevertheless, our trial court found that the health department did not owe a duty to Logan Taylor, but that it owed a duty in general to the public. Then the trial court went on further to say even if a duty was owed, the decision to not vaccinate Logan Taylor with Prevnar was a discretionary act for which it was immunized under Section 104 of the Tort Immunity Act. Just briefly to give you a factual background, Logan Taylor was born on December 31st of 2004. By March of 2005, he's at his first well-baby checkup. At that well-baby checkup, the pediatrician refers him down to the public health department to get his immunizations. He goes down to get his immunizations. The health department accepts him as a patient. They vaccinate him with all of the recommended childhood vaccines with the exception of Prevnar. Prevnar is a vaccine which prevents pneumococcal bacterial disease, including bacterial meningitis. Logan went back to his pediatrician on two-month intervals. Each time they went back to the public health department, got his vaccines, everything but Prevnar, and each time they would give the drug or give the vaccines, it was back to transfer it over to his pediatrician, what vaccines the child had received. The card was always blank for Prevnar. The reason he was not receiving Prevnar was that the county health department had created a policy that said we're only going to vaccinate with Prevnar children enrolled in daycare. Is there any factual dispute about whether or not that policy existed? There is no written policy. The only policy they testified, though, that that was their policy and that's what they did. They only afforded Prevnar to those children who were enrolled in daycare, and Logan Taylor was not enrolled in daycare at the time. The record doesn't have any contrary facts, though, to their assertion that they had that policy. Is that right? Right, and we have no evidence that they were making that up. They just all testified there was no policy on the basis of just what we did. Now, at the time, the only reason Logan would be at the health department was because they were participants in the Vaccines for Children's Program. Vaccines for Children's Program is a federal program which provides vaccines free of charge, and to enroll in that program or be a participant in that program, you have to agree to follow the CDC guidelines. There's an enrollment form that says, essentially, and I'm paraphrasing, that we will follow the CDC guidelines when we're given immunization. Let me just ask you, in your appendix you have a blank copy of that provider enrollment. Right. And anywhere in the record, do we have the actual one that they signed up for? They were not able to produce theirs in discovery, but it's – They agreed it was just like this. Yeah, everyone agrees that they were a VFC participant, and that is the rules of the VFC program that's cited in the facts. It's online, you can see it, and that is a copy of the actual form that is used to enroll. All right, now, again, as far as the record is concerned, you assert that their participation in this program required them to give all CDC-recommended vaccinations. Absolutely. They produced testimony from people in their Bicounty Public Health Department that that was not accurate. Did you – is there anything in the record on your side of the case that that's what this meant? Well, I – That the webinar hadn't been given. Right. Well, their policy definitely varied from the VFC policy. There's no question that it varied from that. Our point is – our position was that they had no discretion to vary from that CDC recommendation schedule, and there's good reason for that. The CDC, the Department of Health and Human Services, is the top public health department in this nation, and they have this program, which is the VFC program, for trying to eradicate childhood diseases. And one of the ways of doing that is they have a uniform schedule of vaccines. It would be pointless to let each little health department come up with their own vaccine policy. If you don't vaccine all the children, you can't eradicate the disease. You can't just give it to some people and hope that you'll eradicate the bacterial disease. The provider enrollment form specifically says, as an exception to following the CDC guidelines, that in making a medical judgment in accordance with accepted medical practice, if the public health department deems such compliance to be medically inappropriate, would their policy not fall under that exception? No, because there was no – just because they made it so, it would have to be medically necessary and accepted standard practices. There is no organization that's recommended that Prevnar be given only to daycare attendees. That would be a question of fact at best, but under this case scenario, no one has suggested that there were any recommendations out there or any regulations that stated that only daycare employees should be given this vaccine. To the contrary, every bit of testimony and every bit of the written documentation has been that all children receive Prevnar at set intervals. It's all agreed that there's a two-month, a four-month, a six-month, and then a booster at 15 months. That is the accepted practice, and that's ordered by the CDC with vaccinations. Now, they presented testimony – and I haven't let you get to it yet, I'm sorry. I understand you went through a summary judgment procedure. There were depositions and affidavits – mainly depositions, I guess, involving a summary judgment proceeding. And people affiliated with the Public Health Department testified, I take it, that this was a medical judgment that they made. They didn't say it was a medical judgment. They're not medical professionals. I mean, like Mr. Smith, Dr. Smith, is not a physician. What they said was they had competing interests and they wanted to preserve their Prevnar supply. And they testified they could do that under this. I don't believe anyone testified that they could under the VFC program. They said that was their internal policy. All of it was never formulated. That's just what they testified to. They said, well, we decided to do this to conserve our supply. But it doesn't hold water because under the VFC program, they get their vaccines for free, and they get them upon request. Okay, and here's what I'm trying to get at. I mean, because I think a lot of your argument turns on this VFC program and whether they're bound by it. Did you present any expert testimony? I'm not saying you had to, but was there any expert testimony or did any witness testify that a public health department cannot deviate from the CDC guidelines under this provider enrollment agreement? Well, I don't think anyone testified that they couldn't deviate under the VFC program, but the VFC program by its own terms, we suggest, is mandatory obligations upon them. Okay, so your reliance is solely on our interpretation, then, of that contract. Of that contract, and we did have a pediatric infectious disease individual who gave us disclosure stating that they were required to do that, to abide by the CDC schedules. Okay, so you did have expert testimony. Yeah, we have a pediatric, yes. So it is our position that Section 104 has no application to this case because really it's a ministerial act and not a discretionary act. The discretionary act would have been the decision to enroll in the VFC program or to accept Logan Taylor as a patient. But once that was done, this came into a pure ministerial act, which was here's the schedule for vaccines, and here's what we're going to give them to him. And that goes back to the other suggestion that maybe there was a medically necessary reason not to provide him with Prevnar. They had given him seven other vaccines, and they had elected not to give this one. There was no medically accepted reason to give him seven vaccines and not Prevnar. Prevnar has no more adverse reactions than any potential adverse reactions from the other vaccines that were received each time he appeared at the health department. The seven other vaccines were all required by state law before you could attend school. Was that right? It has nothing to do with school. He was not an enrolled child. These are the recommended vaccines created by the CDC schedule. The CDC schedule is in the record and in the brief from that period on. Schools have schedules for what you have to have to have vaccines, but it has nothing to do with what we were doing or what they were doing for long at that time. He was in that way. He was two months old, two months old. So it's our position that there is no immunity under Section 104, and certainly they owe a duty to him just as they would have, the pediatrician would have owed him the same duty when providing the vaccines. If there is immunity, is it absolute? Pardon me? Is it absolute immunity that even if their actions were willful, they would still be immune if it applies? No. We believe that even if there was immunity, there would have had no exceptions or there would have been exceptions for willful and moral misconduct, which we allege, and the court found that there was no exception. And same thing with the court also found that there was a duty owed to the public and not individually to Logan Taylor, so that the duty to abide by the preventive policy was owed generally to the general public and not to Logan Taylor, and it's been our position in the brief that Logan Taylor was a patient. Just like he was a patient at the pediatrician's office, he was a patient there. And regardless if you are a public entity or a private entity, you owe the same duty in care as you would whether you were given that vaccine or accepted the responsibility to give those vaccines in the pediatrician's office or at the county health department. We cited in our brief section 299A that we say with a torts, which states that members of the trade or profession owe the same duty as law members of that same trade or profession. Anyone giving vaccines has to abide, childhood vaccines, would have to abide by the same schedule. If they're participants in the VFC program. Just to make sure I understand your argument, you're arguing that the standard of care is established by the CDC guidelines. The standard of care, yeah, this isn't really a standard of care issue, and I may have misspoken. It's really a duty of care. It's a duty issue, whether or not a legal duty was owed a reasonable care. And the trial court found that there was no legal duty, and we suggest otherwise that this was just like any other going to the pediatrician's office. There's been no suggestion that the pediatrician in this case does not owe the retailer a duty of care. And likewise, the nurses at the county health department who are administering the shots and the health department itself owed him a duty of care. To use reasonable care when giving. But even if there was no, even if there was a public duty, though, we suggest or we argue that the exception to the public duty would be the special duty exception, which is contained in the case law. The Fryman case has been cited throughout the briefs, which is that if an individual comes under the care of a public official, they have, once they're under their care and control, they have a duty to exercise reasonable care at that point. And that would be an exception to the public duty. Generally, those are police officer cases and things along those lines, but it is still the situation here, which is once they've accepted Logan Taylor, he's been elevated from the general public to a specific individual under their care, and they have a duty at that time to either abide by, use reasonable care, and we can dispute what reasonable care is, but they would have a duty at that point to abide by it and honor it, or at least advise his mother that they weren't getting Krebner. So at this point, I really don't have much more to add, but if you have any questions. Give me just a second here. Sure. What I'm looking for is 4-106. It is on. I'm sorry, it's 104. Yeah, 6-104. I said 4-106. Converted it. Okay. I don't think I have a question. Thank you. Mr. Attorney. May it please the Court. Let me start off by thanking you. I know it's a privilege to come here and not arrive. I appreciate you allowing me to move in this morning to RUT here. The record in this case is awfully clear. We're Monroe-Randolph Bi-County Health Department. We're a public entity whose mission is to suppress and prevent communicable disease outbreaks and to improve quality of life for Monroe and Randolph County citizens. Now, something occurred to me when I was reading the plaintiff's reply brief a few weeks ago that explains why we've been here for three years. It's because the plaintiff wants us to be somebody that we're not. You see, the plaintiff had in his brief an excerpt that talks about eradicating disease in all children. That would be a great goal, but that's not why we're here. You see, to the extent we have any patients at all, we really only have one, and that is the entire community of citizens in Monroe and Randolph Counties. When Logan Taylor walked into our facility on three occasions, it's not five occasions, it's three occasions, March, May, and August of 2005. Those are the only three occasions he came into our facility for vaccinations. When he came into that facility on those dates, it wasn't just him coming into our facility. And I put in the brief a little quip about the Verizon wireless commercial where you see the guy that has this guy with the glasses, the helicopters, and the whole network of people behind him. That is who came in to Monroe-Randolph Bi-County Health Department on those three occasions. It wasn't Logan Taylor. You see, it was the entire community. All of the citizens collectively followed Logan Taylor into that facility. Because our role that the Illinois legislature gave us is to prevent against communicable disease outbreaks, not private health issues. People don't come to us for a head cold or for allergies or for the flu. They come to us because we want to try to limit disease. That is the statutory authority we have in 55 ILCS 5-5-25013 that I find interesting, has been minimized to a large degree throughout this entire case. Because that is our authority. Okay? Now, the Metzger case, and I cited a case named Moore, and I understand it's a first district case, and that is merely persuasive authority if you choose to adopt the reasoning. But that is about as close to a factually consistent case as we can have here. And the Moore case reiterated the Illinois Supreme Court four-step process of determining whether the legislature intended to create a private right of action. In other words, is there a private duty to Logan Taylor from an entity that was created to protect public health? Those four elements, the plaintiff must be a member of the protected class. Second, the private action must be consistent with the statutory purpose. The injury must be one that the statute prevented. And the private action must be necessary for a remedy. And I want to focus on just a couple of those. I'll start with the last first. A private action against the Grover Randolph-Meyer County Health Department is not necessary in this case. You know, there's still two defendants left. In front of Judge Shewer, and soon to be, I guess, Judge Brown, in Randolph County. From whom, they're viable defendants, from whom the plaintiff can recover. So number four is not met. We are not required to be here in order to have a remedy be a provider. Was this injury one that the statute prevented? On its face, you might say, yeah, it was. But look closely, no, it's not. You see, the statute seeks to prevent the outbreak or the transmission of communicable diseases. This is the swine flu. We want to prevent an epidemic, a pandemic. We're not here to prevent individual cases. That's what the individual's pediatrician is there for. And that, consequently, is why we fax the vaccine supply sheets to the pediatrician after every time Logan Taylor brought the rest of the community into our facility room. We communicated that to his pediatrician so she could take the next step if she thought it medically necessary. To say, okay, now, on this individual basis, Logan, we might need to protect you more than what you are protected on behalf of the community. Is there anything on this fax that says that? We're sending this to you so that you can make a judgment as to this individual patient as to whether this patient needs the vaccinations that he was not given. Does it say that? I don't think on the form itself it says that. It's just left blank. Right. Well, the way the form is pictured is there are six or seven different vaccines that are listed, and we checked the ones that were given. And then the attending physician knows what was given and what was not given. That's correct. And that is disputed testimony. In fact, the doctor who was opposed, as well as her staff members, they all knew the whole time that we did not give PrEP to Logan Taylor. So that's not even a disputed issue in this case. And I don't want to belabor those four topics. I apologize for the length of our brief, but we wanted to be very detailed, and I think we were fairly detailed about that in the brief. Let me go ahead and ask you a question, if I can. And then an argument made by Mr. Darr. All right, the Bike County Health Department signs this provider enrollment agreement and says we agree to follow the DHHS Advisory Committee on immunizations, et cetera, and then you establish a policy that's going to deviate from that, and you say you can do that, right? That's right. Then, as Mr. Darr argues, can't every county health department then decide they're going to deviate from that? And if so, what's the purpose in even agreeing to follow the DHHS guidelines? Well, and let me break that down, if you don't mind, a little bit, Your Honor. Yeah. First off, it's absolutely appropriate for each community health department to have its own vaccine policies. Different communities will have different needs, which, in fact, is why the Illinois legislature gave us that discretionary power. The Illinois legislature doesn't want to convene every time a decision like this has to be made. So that is appropriate for each community health department to do that. Now, back to the form. It's interesting to note the date at the bottom of the form. April 2005, I believe, is on there. We all understand the first time Logan came to our facility was in March of 2005. Then he came in in May and August of 2005. The testimony, I believe, in the record, Pam Bertzler, who was the only witness, I think, who was asked about that form, indicated it wasn't until October that we even got that form anyway. And so this is why, and Your Honor touched on this with Mr. Gard. Why isn't there testimony about that document? Why didn't the plaintiff come forward pursuant to Rule 191 to say, hey, here's an affidavit or a deposition that explains the impact of that form on our policy? Now, whether or not there was a written policy in effect has gotten a little bit confusing. And I don't know that under Illinois law the policy has to be written. And for times, I believe, that there wasn't necessarily a written policy for some times, right? And in Harrison, it was a policy about whether to let the student go home. I believe in your dissenting opinion, and you noted as the Supreme Court affirmed your dissenting opinion. Yeah, this is a policy decision that's made on the fly. I don't think it has to be in writing. But now it is interesting that the actual written policy is in the record of 1699, C1699. And whether that is a written policy or a memorandum about a policy, none of this policy existed. And that was back in 2001. And now this whole CDC issue, the other interesting thing on the CDC issue is the plaintiff focuses on this form that's C1998. But there's another form, Illinois Department of Public Health, that's in the record, C1716. Before you go there, let me ask you another question about the provider enrollment form at C1998. Are you saying then that the evidence in the record would be that that form was not even signed until after Logan began coming to the health department? That's my understanding. And was there some predecessor form? And was there any testimony about that? So it would have just been this one? That's as far as I know. That's as far as the record shows. And the other interesting thing, the reason this record came up is in the deposition testimony. There was kind of a meeting that had happened with the IDPH. I don't think that there's any evidence in the record at any time that IDPH had a problem with the presidential policy anyway, which rightly so. Is there any evidence they knew about? I'm not sure in the record if that was ever developed by the plaintiff. And I keep in mind the plaintiff deposed not one but two people from my county health department. Had three years to further develop this. I filed a summary judgment motion. They could have filed a 191B affidavit saying, hey, your honor, hold up, because there's evidence out there that can counter your thought process here. He never did that. And so the purpose of summary judgment in Illinois is particularly important in this case where a government entity is trying to allocate our resources in the best way we can. And one way that we should not be tying up our resources is in litigation when the case is really about an individual duty of care owed by a pediatrician, not a government entity. We are not there to give free health care. We're not there for that reason. We're here to protect and promote public health. So I don't think that they even get past that public duty analysis is why we're here. Public duty must – the public duty bars this private cause of action. Now, I wouldn't be doing my job if I didn't consider the possibility that maybe the panel is convinced there's a public duty. The plaintiff has to prove a special duty exception. If we have a public duty, the plaintiff has to show that they have a special duty. I kind of mixed that up. I apologize. Let's say that you say we have a public duty. Do they show that there's a special duty that we owe to Logan Taylor? There's four prongs, four elements of a special duty. I'll focus on the first and the fourth because the rest are addressed in our brief. There has to be a particular imminent risk, and we have to have actual knowledge of that risk. This is where the dates come in very – come very important to this case. We last saw, to immunize Logan Taylor in August of 2005, he gets meningitis in June of 2006, nine months after the last time he comes to us for vaccines. In fact, he went to his individual pediatrician twice for vaccines. After the last time he saw us in August of 2005. See, he went for a flu shot from Dr. Berner in January of 2006 and then actually got a Prevnar catch-up shot in April of 2006. He got meningitis in June of 2006. So you see, we did not have control over his health care, and there was no particular imminent risk. Again, the undisputed facts of the record, even Dr. Berenkamp, who the plaintiff referenced in his argument, the infectious disease specialist, he even admitted, hey, you know what, your policy kind of makes sense because daycare is where this disease is spread. That's where it's transmitted, and if you're going to try and stop the transmission of this disease, yeah, daycare is a high risk. And so Logan not being in daycare gave us the idea, look, he's not at a particular imminent risk of getting this disease. He's not in daycare where it's spread. So the plaintiffs cannot meet the first problem of the special duty analysis, let alone the fourth problem, which requires that the injury occurs while under our care and control. Two points on that. Again, we never had control of his health care. That's why we faxed this form to Dr. Berner after every visit. We couldn't order prescriptions. We couldn't teach him or tell him to do certain things a certain way like a doctor can. We didn't have control over his health care. And if ever we did, we certainly didn't in June of 06. So these are undisputed facts that entitle us to judgment because there's simply no individual duty for Logan Taylor. So now, special duty. Even if the plaintiffs get special duty, we still have to address this issue of immunity, and that's where the 6-104A comes in. Absolute immunity, absolutely it is. There is no willful and wanton exception in that statute. You understand that A is a policy portion, and I call it the policy portion of the statute, and B is the action portion of the statute. So under A, it doesn't matter what our policy is. If we have a policy, we're protected, even if that policy is a result of an abuse of our discretion. See, the legislature wanted this to never happen. The legislature did not want us tying up our resources in litigation because someone simply doesn't like our policy. And so even if the plaintiffs can get past the special duty, which I don't think they can, they still have to overcome the 6-104, which there's no dispute. I mean, it simply applies to our case. We exercise discretion in the Harrison case we talked about earlier. We cited a hearing. It's unique to a particular office. Well, our office was created to protect and promote public health. So we were clearly created with this discretion in mind. We have to have people who are employed that have professional and technical competence. And looking at the case law that's been cited from Illinois, that language says the legislature is screaming discretion. So it's very clear that we're a discretionary department. It's also very clear, whether it's written or not, that we have a policy. And the policy is, from the Harrison case as well as Fangenberg, I believe, another dissent, the Skydiver case, a policy occurs when you balance competing interests to make a judgment call as to which solution best serves each of those interests. Undisputed testimony in the record, we have to consider 14,000 children in Monroe and Randolph County. Not just with whether or not there's a supply of Prevnar that we can inject into their arms, but how many nurses do we have? How big is our facility? How much storage do we have? These are all reasons that we gave for our policy. It's not just a simple matter of whether we can get it from the BFC. And the actual supplies, you know, the plant had made an argument about the actual supply of Prevnar in 2005. That's not even the issue. Because keep in mind, in March, May, and August of 2005, we didn't know what the supply was going to be at the end of the year. That's another part of the policy and the discretion. We have to try to plan. Did we know that there was going to be a major hurricane in the Gulf Coast later that year? No, we didn't. But we have to make our plan. We have to plan, thinking about the entire world of public health. How many of these vaccines are we going to take versus how many we actually need? Keeping in mind the vaccines can go bad if they're not properly stored. In the plant's reply brief, there are a couple of things I want to clear up. He says that we never gave a reason for why our policy changed. See, from 2005 to 2006, our policy did change in those days. He says we never gave a reason why the policy changed, so it must be because we felt horrible about what happened. See, first, of course we feel horrible any time a child gets meningitis. I don't want to minimize that at all. We gave several reasons, 18 pages of deposition testimony as to why our policy changed. We moved to a bigger building. We got an extra refrigerator that could handle the storage. We hired an extra nurse. These are all reasons we gave for why our policy changed. So I wanted to make sure that's very clear since I didn't have a chance to reply to the reply brief. And there's one other issue on the reply brief where there's an excerpt of testimony from Tom Smith, and an objection that I made was included in the excerpt in the reply brief. And I mentioned something about these are VFC-required vaccines. And the implication, based on where the testimony was cut off in the reply brief, is that Prevnar was one of the required vaccines. But what we were talking about is this form. I referenced this a little bit earlier. We're referencing form C1716. It's a vaccine for children plus patient eligibility reference sheet. And you see it's two different charts on one page. And I was referring to the top chart when I said these are required vaccines. See, it has these vaccines listed and additional eligibility criteria, no additional requirements. Is that in the appendix you said? It's in the record on C1716. I don't know that this made it to the appendix. But the bottom chart reads, in addition to the above criteria, please note the following vaccines require additional screening to determine eligibility. And Prevnar is in the bottom chart. The bottom chart of this page. And that's what I was referring to. Let's play this document again. Tell us what that is again. It's an Illinois Department of Public Health vaccines for children plus patient eligibility reference sheet. It's C1716. And now, again, I have to say, I don't think that any of this VFC really matters. It's not testimony. It's not affidavits. As far as I'm concerned, it's not really competent evidence that Judge Shuerk, in fairness to him, was allowed to really develop in the three times that we showed up to argue this issue in front of him. Three times we showed up to argue these issues. All three times he said, look, you simply have not proven your case plan. They have discretion. They have a policy in place. But more importantly, they're a creature of a public duty statute, and their role is to protect and promote public health by controlling disease outbreaks, not individual diseases. So I've rambled on for a while, but I want to see if you have any additional questions. Thank you very much. Thank you. Mr. Darn, you're above. My county's attorney said that their goal is to eradicate disease or control outbreaks in a two-county area. And that may be fine, but they should have never – that's not the goal of the Vaccines for Children's program. The goal of the Vaccines for Children's program is to eradicate these diseases nationwide at a minimum. So that's why when they signed on to be the VFC participant, they needed to abide by those goals because they were trying to achieve the goals of the nation, not the goals of a local community. Now, understand that the VFC program – you have to understand it's not just the county health department who is participating in this program. Physicians' office, all types of entities are participants in the VFC program. It wasn't just the county, but they all have the same obligations, which are you have to abide by a schedule that is created on a federal level. You're not free to move about and decide what vaccines you're going to give because the goal on a federal level is to eradicate this disease all along from everybody. And daycare is just one place where you can get bacterial disease, but you can get it going to Walmart, you can get it going over to your neighbor's house, you can get it in different places. That's why it's important for all children to have these vaccines. And we're not basing our claim on the Department of Public Health Act in the state of Illinois. We have a straightforward common law negligence claim. We're not looking to that statute or that scheme to give us a cause of action. And just mopping up here, no one has ever disputed that this was the terms of the VFC program or that they enrolled in that program. That's never been a dispute. Judge Schwartz ruled, though, that it was a discretionary act to create its own policy, which was different than what we argue, which is the discretionary act, if anything, was to enroll in the VFC program. That is a discretionary act, and if they had chosen not to enroll in that program, we would not be able to come forward later and say, you should have enrolled, you should have given us vaccines. But once they did enroll, all their discretion was removed at that point, and they were left with the CDC schedules, and they had to abide by them. They didn't, and as a result, this child is brain damaged for life. And then I just wanted to address briefly the special duty. They stated that Logan Taylor was not under their care at the time he contracted bacterial meningitis, which is true. He had not been back for a while. But what happened was he was under their care when he needed the shots at two, four, and six months. That's when he was under their care. He didn't get the shots at that point. It was important for him to get it at two, four, and six months so that he would have immunity at 16 months. Immunity doesn't come by just giving you an injection, and the next day you have immunity. Your body has to develop these immunities over time by getting these injections, and that's why you have to have them over a series of injections. Had they exercised due care back at two months, four months, and six months, when Logan was under their control, at 16 months, he would have had the immunities in place, and he would not have had bacterial meningitis. So he does meet that problem. Thanks. Questions? No questions. All right. Thank you very much, Mr. Dar. Thank you both for your briefs and your arguments. We'll take this matter under advisement.